**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ISHAY VICTORIA FERGUSON ) | CASE NO. | |
| 4359 Alkire Glen Way ) | | |
| Columbus, Ohio 43228, ) | JUDGE: | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | **COMPLAINT FOR DAMAGES** | |
| ) | **AND INJUNCTIVE RELIEF** | |
| PENSKE TRUCK LEASING CO., L.P. ) | | |
| 2470 Westbelt Drive ) | **JURY DEMAND ENDORSED** | |
| Columbus, Ohio 43228 ) | **HEREIN** | |
| ) | | |
| **Serve Also:** ) | | |
| Penske Truck Leasing Co., L.P. ) | | |
| c/o Corporation Service Company ) | | |
| 50 West Broad Street ) | | |
| Suite 1330 ) | | |
| Columbus, Ohio 43215 ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

Plaintiff, Ishay Victoria Ferguson, by and through undersigned counsel, as her Complaint against Defendant Penske, states and avers the following:

**PARTIES, VENUE, & JURISDICTION**

1. Ferguson is a resident of the city of Columbus, Franklin County, Ohio.

2. At all times herein, Ferguson was acting in the course and scope of her employment.

3. Penske is a foreign limited partnership that does business at 2740 Westbelt Drive, Columbus, Franklin County, Ohio 43229.

4. Penske is and, at all times herein, was an employer within the meaning of R.C. § 4112.01 *et seq.*

5. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Ferguson is alleging a Federal Law Claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Family & Medical Leave Act ("FMLA"), 29 U.S.C § 2601 *et seq.*

6. All material events alleged in this Complaint occurred in Franklin County, Ohio.

7. This Court has supplemental jurisdiction over Ferguson's state law claims pursuant to 28 U.S.C. § 1367 as Ferguson's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

9. Within 300 days of the conduct alleged below, Ferguson filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge Nos. 532-2020-01042 & 532-2020-02524 against Penske ("Ferguson EEOC Charges").

10. Ferguson dually filed the Ferguson EEOC Charges with the EEOC and the Ohio Civil Rights Commission.

11. On or about August 15, 2021, the EEOC issued a Notice of Right to Sue letter to Ferguson regarding the Charges of Discrimination brought by Ferguson against Penske.

12. Ferguson received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit A.

13. Ferguson has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

14. Ferguson has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## **FACTS**

15. On or about April 10, 2018, Ferguson began working for Penske.

16. Penske employed Ferguson as a customer service representative.

17. Penske was, at all times hereinafter mentioned, engaged in commerce or in an industry or activity affecting commerce and employed 50 or more employees for each working day during each of 20 or more calendar work weeks in the current or preceding calendar year and therefore is an employer as defined in 29 U.S.C § 2611(4).

18. At all times relevant herein, Ferguson was employed by Penske for at least 12 months and had at least 1,250 hours of service with Penske and therefore was an "eligible employee" under FMLA, as that term is defined in 29 U.S.C. § 2611(2)(A).

19. Ferguson is female.

20. Ferguson is African American.

21. Ferguson is lesbian.

22. In or about early 2019, Ferguson had a coworker named Guy (Last Name Unknown).

23. Guy LNU and Ferguson had the same job title.

24. Guy LNU is male.

25. Guy LNU is Caucasian.

26. Upon information and belief, Guy is heterosexual.

27. In or about early 2019, Ferguson asked Guy LNU for help with power washing.

28. When Ferguson asked Guy LNU for help with power washing, he replied, "I don't take directions from women."

29. The following day, Guy LNU instructed Ferguson to turn off a power washer.

30. Guy LNU did not have authority to give instructions to Ferguson.

31. In response to Guy's instruction, Ferguson jokingly replied, "I don't take directions from men" ("Joking Comment").

32. Ferguson's Joking Comment directly echoed the wording of a comment Guy LNU made to Ferguson the previous day.

33. After Ferguson made the Joking Comment, Ferguson turned off the power washer, as Guy LNU had instructed her to do.

34. As a result of the Joking Comment, Penske required Ferguson to attend a meeting they described as a "termination hearing" ("First Termination Hearing").

35. At the First Termination Hearing, Penske issued Ferguson a disciplinary warning.

36. Penske did not discipline Guy LNU for the nearly-identical comment he made to Ferguson.

37. In or about early July 2019, Ferguson reported to Penske's human resources department and to Charlie Oglebay that Penske was disciplining her more harshly than similarly-situated coworkers because of her race, gender, and sexual orientation ("First Report of Discrimination").

38. Penske has a policy against discrimination ("Discrimination Policy").

39. Penske's Discrimination Policy precludes retaliation against employees who complain about discrimination.

40. Alternatively, retaliation against employees who complain about discrimination is permitted by Penske.

41. Penske's Discrimination Policy precludes intimidation against employees who complain about discrimination.

42. Alternatively, intimidation against employees who complain about discrimination is permitted by Penske.

43. Penske's Discrimination Policy requires employees to report what they reasonably believe is a violation of the Discrimination Policy.

44. Penske's Discrimination Policy precludes retaliation against employees who report a violation of the Discrimination Policy.

45. Alternatively, retaliation against employees who report a violation of the Discrimination Policy is permitted by Penske.

46. Penske's Discrimination Policy precludes intimidation against employees who report a violation of the Discrimination Policy.

47. Alternatively, intimidation against employees who report a violation of the Discrimination Policy is permitted by Penske.

48. Discriminatory discipline violates the Discrimination Policy.

49. Penske has a policy to investigate reports of violations of its Discrimination Policy.

50. An investigation should include interviewing the complainant.

51. An investigation should include interviewing the subject of the complaint.

52. An investigation should include interviewing the subject of the reported discrimination.

53. An investigation should include interviewing witnesses to the reported discrimination.

54. An investigation should include getting a written statement from the complainant.

55. An investigation should include getting a written statement from the subject of the complaint.

56. An investigation should include getting a written statement from the subject of the reported discrimination.

57. In response to Ferguson's First Report of Discrimination, Penske did not interview Ferguson.

58. In response to Ferguson's First Report of Discrimination, Penske did not interview witnesses.

59. In response to Ferguson's First Report of Discrimination, Penske did not get a written statement from Ferguson.

60. In response to Ferguson's First Report of Discrimination, Penske did not get a written statement from witnesses.

61. Penske did not investigate Ferguson's First Report of Discrimination.

62. Penske did not terminate anyone's employment in response to the First Report of Discrimination.

63. Penske did not give anyone a verbal warning in response to the First Report of Discrimination.

64. Penske did not give anyone a written warning in response to the First Report of Discrimination.

65. Penske did not give anyone a final warning in response to the First Report of Discrimination.

66. Penske did not give anyone a suspension in response to the First Report of Discrimination.

67. Penske did not discipline anyone at all in response to the First Report of Discrimination.

68. In the week after Ferguson made her First Report of Discrimination, Penske gave Ferguson two written disciplinary warnings ("Retaliatory Warnings").

69. The Retaliatory Warnings were an adverse employment action.

70. The Retaliatory Warnings were an adverse action.

71. Ferguson gave the Retaliatory Warnings intentionally.

72. Ferguson gave the Retaliatory Warnings willfully.

73. Penske gave Ferguson the Retaliatory Warnings in retaliation for her First Report of Discrimination.

74. Penske gave Ferguson the Retaliatory Warnings because of her race.

75. Penske gave Ferguson the Retaliatory Warnings because of her gender.

76. Penske gave Ferguson the Retaliatory Warnings because of her sexual orientation.

77. On or about December 16, 2019, Ferguson was sick with flu symptoms.

78. On or about December 16, 2019, James (Last Name Unknown) and Kris (Last Name Unknown) instructed Ferguson to take sick leave due to her illness.

79. James LNU was Ferguson's shift lead.

80. Kris LNU was Ferguson's supervisor.

81. On or about December 15, 2019, Ferguson had worked for Penske for more than 12 months.

82. On or about December 15, 2019, Ferguson's illness was a serious medical condition within the meaning of FMLA.

83. On or about December 15, 2019, Ferguson had used less than 12 weeks of FMLA leave in the preceding 12 months.

84. On or about December 15, 2019, Ferguson qualified for FMLA leave.

85. Penske did not provide Ferguson with any paperwork to fill out to use FMLA leave.

86. Penske did not inform Ferguson that she was eligible for FMLA leave.

87. On or about December 16, 2019, Ferguson still had flu symptoms.

88. On or about December 16, 2019, Ferguson contacted Kerri Jackson via email to request to use sick leave.

89. Jackson performed human resources functions for Penske.

90. On or about December 16, 2019, Jackson told Ferguson that Penske's system showed that Ferguson had available sick leave but Jackson believed it was an error.

91. On or about December 17, 2019, Penske gave Ferguson a suspension ("Suspension").

92. Penske stated that the reason for the Suspension was that Ferguson "called off sick without having any sick time available to use."

93. If Penske's stated reason for the Suspension was the actual reason for the Suspension, Penske gave Ferguson the Suspension in order to prevent her from using qualified FMLA leave.

94. If Penske's stated reason for the Suspension was the actual reason for the Suspension, Penske gave Ferguson the Suspension in retaliation for her use of qualified FMLA leave.

95. In the alternative, Penske's stated reason for the Suspension was not the actual reason for the Suspension.

96. Penske gave Ferguson the Suspension because of her race.

97. Penske gave Ferguson the Suspension because of her gender.

98. Penske gave Ferguson the Suspension because of her sexual orientation.

99. Penske gave Ferguson the Suspension because she opposed discrimination.

100. On or about December 22, 2019, Ferguson's coworker Raymond (Last Name Unknown) called her a "nigger" (hereinafter, the "N-word") multiple times at work.

101. Raymond LNU is Caucasian.

102. The N-word is an offensive racial slur toward African Americans.

103. On or about December 22, 2019, Ferguson reported to Penske's human resources department that Raymond LNU said the N-word multiple times ("Report of Racial Slur").

104. Ferguson's Caucasian coworker, Joey Kase, also witnessed Raymond LNU using the N-word.

105. Kase corroborated Ferguson's Report of Racial Slur.

106. After Ferguson's Report of Racial Slur, Andy Boff and Sam Webster confronted Kase for corroborating Ferguson's Report of Racial Slur.

107. Boff was regional human resources manager for Penske.

108. Webster was branch manager for Penske.

109. After Ferguson's Report of Racial Slur, Penske terminated Raymond LNU's employment.

110. On or about December 26, 2019, Ferguson requested a day off work due to a surgery on her foot.

111. On or about December 26, 2019, Ferguson provided a doctor's note due to the surgery on her foot.

112. On or about December 26, 2019, Ferguson qualified for FMLA leave.

113. On or about January 29, 2020, Ferguson spoke with Katie Brown via phone ("Call with Brown").

114. Katie Brown was human resources manager for Penske.

115. In the Call with Brown, Ferguson complained that Penske was discriminating against her because of her race, gender, and sexual orientation.

116. In the Call with Brown, Brown said, "People have been fired because of you. You don't have a serious health condition; your FMLA will be denied; tomorrow you will be terminated; and I fully support the decision."

117. When Brown said that "people have been fired because of" Ferguson, she was referring to the termination of Raymond LNU.

118. No one other than Raymond LNU was fired because of Ferguson.

119. On or about January 30, 2020, Penske held a meeting with Ferguson ("Final Termination Hearing").

120. Ferguson, Boff, Webster, Elizabeth Ahrens, and two officials from Ferguson's union attended the Final Termination Hearing.

121. Ahrens was district financial manager for Penske.

122. At the Final Termination Hearing, Boff stated that one reason for the Termination was that he believed Ferguson's December 26 absence was not really due to a serious medical condition.

123. At the Final Termination Hearing, Boff stated that he believed Ferguson would "keep playing this game" of applying for FMLA leave.

124. On or about January 31, 2020, Penske terminated Ferguson's employment ("Termination").

125. Boff informed Ferguson about the Termination.

126. Penske gave Ferguson the Termination in retaliation for making the Report of Racial Slur.

127. Penske gave Ferguson the Termination in order to prevent her from using qualified FMLA leave.

128. Penske gave Ferguson the Termination in retaliation for her use of qualified FMLA leave.

129. Penske knowingly terminated Ferguson's employment.

130. Penske knowingly took an adverse employment action against Ferguson.

131. Penske knowingly took an adverse action against Ferguson.

132. Penske intentionally terminated Ferguson's employment.

133. Penske intentionally took an adverse employment action against Ferguson.

134. Penske intentionally took an adverse action against Ferguson.

135. Penske knew that terminating Ferguson would cause Ferguson harm, including economic harm.

136. Penske willfully terminated Ferguson's employment.

137. Penske willfully took an adverse employment action against Ferguson.

138. Penske willfully took an adverse action against Ferguson.

139. On or about January 31, 2020, Penske terminated Ferguson's employment because of her race.

140. On or about January 31, 2020, Penske terminated Ferguson's employment because of her gender.

141. On or about January 31, 2020, Penske terminated Ferguson's employment because of her sexual orientation.

142. On or about January 31, 2020, Penske terminated Ferguson's employment because of her opposition to discrimination.

143. On or about January 31, 2020, Penske terminated Ferguson's employment in order to prevent her from using qualified FMLA leave.

144. On or about January 31, 2020, Penske terminated Ferguson's employment in retaliation for her use of qualified FMLA leave.

145. As a direct and proximate result of Penske's conduct, Ferguson suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT I: UNLAWFUL INTERFERENCE WITH FMLA RIGHTS

146. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

147. Pursuant to 29 U.S.C. § 2601 *et seq*., covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

148. Penske is a covered employer under FMLA.

149. During her employment, Ferguson qualified for FMLA leave.

150. During her employment, Ferguson attempted to request FMLA leave by asking Penske if she qualified to take FMLA leave.

151. Penske failed to advise Ferguson properly of her rights under FMLA.

152. Penske violated section 825.300(c)(1) of FMLA and interfered with Ferguson's FMLA rights when Penske suspended Ferguson for her approved use of FMLA leave.

153. Penske terminated Ferguson's employment in order to prevent her from using qualified FMLA leave.

154. As a direct and proximate result of Penske's conduct, Ferguson is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

### COUNT II: RETALIATION IN VIOLATION OF FMLA

155. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

156. During her employment, Ferguson utilized FMLA leave.

157. After Ferguson utilized her qualified FMLA leave, Penske retaliated against her.

158. Penske retaliated against Ferguson by terminating her employment.

159. Penske willfully retaliated against Ferguson in violation of 29 U.S.C. § 2615(a).

160. As a direct and proximate result of Penske's wrongful conduct, Ferguson is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

### COUNT III: GENDER & SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF TITLE VII

161. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

162. Ferguson is a member of a statutorily protected class based on her gender under Title VII.

163. Penske treated Ferguson differently than other similarly-situated employees based on her gender.

164. Penske treated Ferguson differently than other similarly-situated employees based on her sexual orientation.

165. Penske discriminated against Ferguson on the basis of her gender throughout her employment with the company.

166. Penske terminated Ferguson's employment without just cause.

167. Penske terminated Ferguson's employment based on her gender.

168. Penske terminated Ferguson's employment based on her sexual orientation.

169. Penske's discrimination against Ferguson based on her gender violates Title VII.

170. As a direct and proximate result of Penske's conduct, Ferguson suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT IV: GENDER & SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.*

171. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

172. Ferguson is a member of a statutorily protected class based on her gender under R.C. § 4112.02.

173. Penske treated Ferguson differently than other similarly-situated employees based on her gender.

174. Penske treated Ferguson differently than other similarly-situated employees based on her sexual orientation.

175. Penske discriminated against Ferguson on the basis of her gender throughout her employment with the company.

176. Penske terminated Ferguson's employment without just cause.

177. Penske terminated Ferguson's employment based on her gender.

178. Penske terminated Ferguson's employment based on her sexual orientation.

179. Penske's discrimination against Ferguson based on her gender violates R.C. § 4112.01 *et seq.*

180. As a direct and proximate result of Penske's conduct, Ferguson suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT V: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

181. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

182. Throughout her employment, Ferguson was fully competent to perform her essential job duties.

183. Penske treated Ferguson differently than other similarly-situated employees based on her race.

184. Penske violated Title VII by discriminating against Ferguson due to her race.

185. On or about January 31, 2020, Penske terminated Ferguson without just cause.

186. At all times material herein, similarly-situated non-African-American employees were not terminated without just cause.

187. Penske terminated Ferguson based on her race.

188. Penske violated Title VII when it terminated Ferguson based on her race.

189. As a direct and proximate result of Penske's conduct, Ferguson has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT VI: RACE DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.*

190. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

191. Throughout her employment, Ferguson was fully competent to perform her essential job duties.

192. Penske treated Ferguson differently than other similarly-situated employees based on her race.

193. Penske violated R.C. § 4112.01 *et seq.* by discriminating against Ferguson due to her race.

194. On or about January 31, 2020, Penske terminated Ferguson without just cause.

195. At all times material herein, similarly-situated non-African-American employees were not terminated without just cause.

196. Penske terminated Ferguson based on her race.

197. Penske violated R.C. § 4112.01 *et seq.* when it terminated Ferguson based on her race.

198. As a direct and proximate result of Penske's conduct, Ferguson has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**COUNT VII: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

199. Ferguson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

200. Throughout her employment, Ferguson was fully competent to perform her essential job duties.

201. Penske treated Ferguson differently than other similarly-situated employees based on her race.

202. Penske violated 42 U.S.C. § 1981 by discriminating against Ferguson due to her race.

203. On or about January 31, 2020, Penske terminated Ferguson without just cause.

204. At all times material herein, similarly-situated non-African-American employees were not terminated without just cause.

205. Penske terminated Ferguson based on her race.

206. Penske violated 42 U.S.C. § 1981 when it terminated Ferguson based on her race.

207. As a direct and proximate result of Penske's conduct, Ferguson has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**COUNT VIII: RETALIATION IN VIOLATION OF TITLE VII**

208. Ferguson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

209. As a result of Penske's discriminatory conduct described above, Ferguson complained about the discrimination she was experiencing.

210. Subsequent to Ferguson's reporting of discrimination, Penske gave her written warnings.

211. Subsequent to Ferguson's reporting of discrimination, Penske gave her the Suspension.

212. Subsequent to Ferguson's reporting of discrimination, Penske gave her the Termination.

213. Penske's actions were retaliatory in nature based on Ferguson's opposition to the unlawful discriminatory conduct.

214. Pursuant to Title VII, it is an unlawful discriminatory practice to retaliate against a person for opposing unlawful discrimination.

215. As a direct and proximate result of Penske's conduct, Ferguson suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**COUNT IX:  RETALIATION IN VIOLATION OF R.C. § 4112.01 *et seq.***

216. Ferguson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

217. As a result of Penske's discriminatory conduct described above, Ferguson complained about the discrimination she was experiencing.

218. Subsequent to Ferguson's reporting of discrimination, Penske gave her written warnings.

219. Subsequent to Ferguson's reporting of discrimination, Penske gave her the Suspension.

220. Subsequent to Ferguson's reporting of discrimination, Penske gave her the Termination.

221. Penske's actions were retaliatory in nature based on Ferguson's opposition to the unlawful discriminatory conduct.

222. Pursuant to R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

223. As a direct and proximate result of Penske's conduct, Ferguson suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Ferguson respectfully requests that this Honorable Court grant the following relief:

(a) Issue a permanent injunction:

    (i) Requiring Penske to abolish discrimination, harassment, and retaliation;

    (ii) Requiring allocation of significant funding and trained staff to implement all changes within two years;

    (iii) Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to investigate complaints promptly and/or take effective action to stop and deter prohibited personnel practices against employees;

    (iv) Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    (v) Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

(b) Issue an order requiring Penske to restore Ferguson to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(c) An award against Defendant of compensatory and monetary damages to compensate Ferguson for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(d) An award of punitive damages against Defendant in an amount in excess of $25,000;

(e) An award of reasonable attorneys' fees and non-taxable costs for Ferguson claims as allowable under law;

(f) An award of the taxable costs of this action; and

(g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Trisha Breedlove*
Trisha Breedlove (0095852)
Paul Filippelli (0097085)
**THE SPITZ LAW FIRM, LLC**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com
Email: paul.filippelli@spitzlawfirm.com
*Attorneys for Plaintiff Ishay Victoria Ferguson*

## JURY DEMAND

Plaintiff Ferguson demands a trial by jury by the maximum number of jurors permitted.

*/s/ Trisha Breedlove*
Trisha Breedlove (0095852)
Paul Filippelli (0097085)

18